KNOLL, Justice.*
11 On August 1, 2002, a Jefferson Parish grand jury indicted defendant, Dustin Dressner, (also known as “Shorty”[1]), with the June 6, 2002, first-degree murder of Paul Fasullo, a violation of La.Rev.Stat. § 14:30. During his arraignment on August 2, 2002, defendant entered a plea of not guilty. Defendant’s jury trial commenced on May 20, 2004.[2] During trial on the merits, the State presented testimony from eleven witnesses before resting its case-in-chief. Thereafter, the defense called two guilt phase witnesses[3] and then rested, concluding the presentation of evidence on May 23, 2004. After hearing closing arguments, receiving the district court’s instructions, and 12deliberating defendant’s guilt for two hours, the jury returned a unanimous verdict of guilty of first-degree murder. Trial on the penalty phase began on the morning of May 24, 2004. Following the presentation of evidence, the jury deliberated for eighty minutes before unanimously returning a verdict of death, finding the offense was committed in an especially heinous, atrocious, or cruel manner, and defendant knowingly created a risk of death or great bodily harm to more than one person. The district court denied defendant’s motion for new trial on October 21, 2004, and sentenced defendant to death in accordance with the jury’s verdict on November 18, 2004.
*130 Under La. Const, art. V, § 5(D), defendant directly appeals his conviction and death sentence, raising twenty-six assignments of error. We will address the most significant errors in this opinion, and the remaining errors will be addressed in an unpublished appendix. After a thorough review of the law and the evidence, we affirm defendant’s first-degree murder conviction and the imposition of the death sentence for the following reasons.
FACTS
The events of that tragic day of June 6, 2002, began with a phone call from Troy Arnaud[4] to defendant requesting a ride to a job interview. Defendant then left his home on 228 Jamie Boulevard in Avondale around 2:00 p.m. and picked up Troy from Billy Rumsfield’s house located at 5313 Taffy Street in Marrero around 3:00 p.m. After first stopping by a store to purchase a fifth of vodka, a fifth of gin, and a jug of fruit punch, the two traveled to Westwego to visit a friend of the defendant. When Troy received a page from Kellen Parker, defendant and Troy returned to the |aRumsfield house where Parker was waiting.[5] The three then drove around all afternoon, drinking the vodka, gin, and Cisco wine, listening to rap music, and smoking about half of a marijuana cigar or “blunt.” During this time, defendant kept up an continuous stream of tough talking, “talking a lot of mess” about “how bad he is” and how “he about whatever.”
At some point, the trio returned to the Westwego home of defendant’s friend to play baseball and later traveled to the apartment complex of defendant’s girlfriend, Ilis Gilbert, in Metairie. While defendant entered the apartment, Troy and Parker remained in the car. Some time later, defendant returned visibly upset.[6] The trio next went to retrieve money from the apartment of Amy Rome in Marrero. Rome was Troy’s girlfriend at the time. Troy went inside, and defendant followed him to get “something flat” from the kitchen drawer, ostensibly to fix his car stereo amplifier, which had been “messing up” on the ride back across the river. Unknown to Troy, defendant actually took two knives, both of which Rome later identified as coming from her kitchen. After leaving her apartment, they drove to a nearby store, where Troy went inside to buy another bottle of Cisco wine.[7]
LAccording to Troy,[8] defendant then claimed he was going to a friend’s house *131 and asked “you-all ‘bout whatever.” Parker responded, “man, I’m ‘bout whatever.” Troy testified, while they had been drinking a lot, defendant did not appear so intoxicated he did not know what he was doing. In his statement, defendant explained he went to the victims’ house for alcohol, which the victims had previously given him at parties in their home located at 5313 Tulip Court in the Oak Cove subdivision of Westwego.[9] Upon arriving at the victims’ house, defendant and Parker proceeded to the front door, while Troy remained in the car.
According to Shannon Fasullo, at approximately 10:30 p.m., her husband, Paul Fasullo, and their two-year-old daughter, Samantha, were asleep in their king-size bed when she heard a knock on the door. When she answered the door, she saw a black male and defendant, who is a white male, known to Shannon from visiting her home on previous occasions with her nephew, Michael Fasullo.[10] Commenting upon the | ¡¡fact Michael’s car was in the driveway, defendant asked if Michael was there and if he could come inside to buy drugs. Shannon answered no to both questions.[11] When she then turned to go inside and close the door, she felt someone strike her “over the head” with something “like a rock,” immediately knocking her down and dislodging her eyeglasses.
Hearing glass break, Troy looked from his vantage point in the car to the doorway and saw defendant holding a broken Cisco wine bottle and Parker “swinging” at Shannon with a knife. Shannon stated the black male attacked her repeatedly while she called for Paul. Finally gaining her feet by using Parker’s leg as leverage, Shannon ran towards the bedroom. Troy witnessed Parker running after her.
In her rush to the bedroom, Shannon noticed Paul in the doorway fighting with defendant over a knife.[12] Upon reaching the bedroom, Shannon closed the door, picked her screaming daughter up from the bed, and called 911. She was only able to scream her address before defendant and Parker broke into the room, wielding knives to renew their attack on her. At that point, Shannon put her child down and tossed the cordless phone under her bed, while the 911 call was still engaged. The murderous mayhem was recorded on tape, including Shannon’s screams, baby *132 Samantha’s frightened cries, and in places, defendant’s own voice saying “this bitch won’t die.”
During the attack in the bedroom, Shannon fell to the ground by the bedside table, under which she partially crawled. Defendant then straddled her and sliced her throat, cutting her three to four times in that area. In fending off defendant’s attack, |BShannon grabbed his hands, and defendant began bargaining with his victim, promising he would let her go if she let him go. In response, Shannon begged him not to hurt her or her daughter. At some point in this deathly struggle, defendant’s watch was pulled off. Thereafter defendant broke loose of Shannon’s hold, and the two men succeeded in pulling her from beneath the table. Shannon then climbed on the bed, and the attack continued, as defendant’s knife slit Shannon’s face open from her “forehead down [her] cheek over [her] left eye” down to her lip, which was gashed in two. Eventually, Shannon was able to get up and lock herself in the bathroom, using her feet pressed to the sink to keep the door closed; however, both defendant and Parker kicked on the door until the frame broke and stabbed Shannon two times in the arm before fleeing the house for fear the police were surely on the way.
Moments later, Parker ran from the house with a pink piggy bank under his shirt, and defendant followed with blood covering his chest and his white muscle shirt thrown over his shoulder. Troy testified defendant got into the front passenger seat, pointed a knife at him, and ordered him to “drive, drive, drive.” Troy drove them out of the neighborhood, but when two police cars passed them on the road, Troy became frightened and drove the car into a ditch. Initially, all three fled the vehicle running.[13] However, defendant went back for his car. Defendant claimed Parker tossed the knives from the moving car shortly after exiting the subdivision.
After waiting a few moments, Shannon pushed the bathroom door she had used as a shield off of her and called for her daughter and her husband. Receiving no 17response, she made several attempts to raise herself from the bathroom floor, but was seized with fits of vomiting as a result of her efforts.
Deputy Robert Pellegrin[14] responded to the dispatch regarding this incident at 5313 Tulip Court. Upon entering the residence, the deputy observed blood and broken glass at the doorway, a crying baby covered in blood, and what appeared to be a deceased body with multiple stab wounds in the hallway. Deputy Pellegrin proceeded to the master bedroom and noticed blood “everywhere,” on the bed, the doorway of the bathroom, and on the bedroom floor. He found Deputy Mendez in the bathroom attending to Shannon, who was lying on the floor in a pool of blood and vomit, suffering from more stab wounds than he could count. Fearing Shannon would not “make it,” he began to question her and was able to obtain a partial description of the perpetrators, including the fact one was a black male and one was a white male, and the name Michael. Deputy Pellegrin then contacted headquarters to request EMS and notified the Detective’s Bureau.
*133 EMT, Patrick Theriot, shortly arrived on the scene. He examined Paul lying in a “large, large pool of blood” and detected no vital signs. EMT Theriot then examined the “inconsolable” baby, who had a busted lip and was covered with blood, in an effort to determine if the blood was her own.[15] He was then called to the bathroom, where he found Shannon in a state of shock, asking for her baby and her husband and suffering from over twenty stab wounds to her back, scalp, face, neck, upper body, arms, and legs. The exact number was not determinable at that time as the blood running from one wound to another obscured the various wounds. While removing Shannon’s nearly lifeless body from the scene, EMT Theriot noticed a | ^broken, bent knife blade within a few feet of her, which he “made specific, careful attention to stay away from” and brought to the deputy’s attention. He then rode with Shannon and Samantha to West Jefferson Medical Center.
Detective David Morales, the case detective, testified upon entering the foyer of the residence he observed a paper bag with some broken glass in it, a bottle neck, and a pah* of ladies’ eyeglasses. He saw Paul Fasullo’s lifeless body in the hallway, clad only in boxer shorts, and blood on the floor leading to the hallway. He noticed the bathroom door with footprints on it appeared to have been forced open, a man’s broken wristwatch, and a silver knife blade. The police forensic team collected the evidence.
At the hospital, Sergeant Dennis Thornton, Detective Morales’s supervisor, interviewed Shannon while she received treatment in the emergency room, and, in her first statement, she gave general descriptions of her two attackers and indicated she recognized the white male as someone connected to an individual, who knew her nephew. Based on the interview, officers spoke with her nephew, Michael Fasullo, who gave police the name of defendant’s friend, Brandon Sapia, who was also interviewed. Dustin Dressner became a suspect and his photograph was included in a six-person line-up prepared with a print track machine.[16] Both Sergeant Thornton and Detective Morales returned to the hospital where Shannon Fasullo, though still receiving care for the stab wound to her face, positively identified defendant as the white male who attacked her. However, Shannon could not identify her black male Rattacker because she did not get a good look at him. An arrest warrant for defendant and a search warrant for his residence, 228 Jamie Boulevard, were issued.
Early on the morning of June 7, 2002, Sergeant Thornton and Detective Morales went to defendant’s house to execute the warrants and were surprised to find him outside, cleaning blood from his car with a bottle of peroxide and a rag. Detective Morales arrested defendant and transported him to the Detective’s Bureau, while Sergeant Thornton executed the search warrant and seized defendant’s clothes and *134 shoes, which he had already begun to launder. Defendant’s car was then towed from the location, and a search warrant for the vehicle was later issued and executed.
Defendant cooperated with police. After the police advised him of his Miranda[17] rights, which he waived, defendant admitted he was involved in the home invasion murder and he inflicted the fatal stab wound to Paul Fasullo’s chest. He named a black man, whom he knew only as “Kelly,” as his partner in crime and also named Troy Arnaud as present in the car. Through some investigative work and the use of computer databases, the detectives came upon the name Kellen Parker and were able to prepare two photographic lineups. Defendant positively identified Troy in the first lineup and Parker in the second lineup. Defendant then assisted the police in identifying relevant addresses, namely Troy’s house and Billy Rums-field’s house from where defendant picked up both Troy and Parker the day before, and in locating the discarded knife and a second knife handle off of which most of the blade had broken. Arrest warrants were issued for both Troy Arnaud and Kellen Parker, as were search warrants for their known residences. The detectives simultaneously executed the search warrants on the residences and, in an abundance of caution, placed the Rums-field’s residence on Taffy Street under surveillance.
| mTroy testified, on the day after the murder, he met up with Parker at the Rumsfield’s house on Taffy Street and asked him what had happened the night before. Parker told him “somebody had got hurt.” Later that evening, both Troy and Parker were apprehended at the Rumsfield house, when the detectives watching the house saw a black male matching Parker’s description on the front lawn and moved on the location. Carol Rumsfield, Billy’s mother, turned over clothes she believed were Parker’s, which had blood on them, and told the officers Parker had spent the previous night at her house.
Through tool marks and fracture match analysis, the broken blade found on the scene was matched with one hundred percent scientific certainty to the knife handle retrieved by the detectives at defendant’s direction. DNA testing revealed Shannon Fasullo could not be excluded as the donor of the blood found on defendant’s jeans, on the interior of defendant’s car door, or on Parker’s shirt. Both Shannon and Paul Fasullo could not be excluded as donors of the blood found on Parker’s jeans and shoes, which shoes Det. Morales seized from Parker’s person after his arrest. Forensic trace evidence analysis showed the shoe print on the bathroom door was made by Parker’s shoe or a shoe with a similar sole pattern.
Dr. Susan Garcia, an expert in the field of forensic pathology, performed an autopsy on the homicide victim, Paul Fasullo, and testified he sustained stab wounds,[18] lacerations,[19] and abrasions[20] primarily to *135 his chest, upper neck, and head Icárea.[21] Only the stab wound to the chest, which was three to four inches deep and five-eights of an inch wide and which entered the chest cavity between the ribs, just left of midline, nicked the left upper lobe of the lung, perforated[22] the pulmonary artery, and penetrated[23] the base of the aorta, was lethal.[24] All the wounds were inflicted concurrently, and no defensive wounds were incurred. The official cause of death was exsanguination resulting from a single stab wound to the chest. According to Dr. Garcia, it is generally accepted a person with such injuries will retain consciousness for three to five minutes only after which time the brain will shut down from lack of oxygen.
ASSIGNMENTS OF ERROR

Pre-Trial

Although the issues in this section were litigated pretrial, we note at the outset this Court has recognized a ruling denying supervisory writs does not bar consideration of the issue on appeal as denial of supervisory review is merely a decision not to exercise this Court’s extraordinary powers of supervisory jurisdiction. State v. Fontenot, 550 So.2d 179 (La.1989). Therefore, the following assignments of error warrant discussion on the merits in this appeal.
1 nExclusion of Victims’ Sexual Misconduct Evidence
Defendant contends in his first assignment of error the district court’s exclusion of critical evidence supporting a manslaughter defense and mitigating defendant’s culpability deprived him of his right to present a complete defense and his right to confront the State’s most important witness, Shannon Fasullo. The issues in this assignment of error arise from the State’s Motion in Limine to Exclude Evidence of Alleged Illicit Behavior Between Defendant’s Girlfriend and Victims. In anticipation of the defense advancing a manslaughter theory that something sexual provoked defendant into killing the victim, the State on the second day of jury selection moved to preclude the defense from introducing evidence regarding alleged sexual misconduct between the victims, Paul and Shannon Fasullo, and defendant’s girlfriend, Ilis Gilbert, stemming from an incident preceding the murder by more than two months. The State also sought to bar the defense from introducing any evidence of narcotics use by the victims as irrelevant. The State argued:
[I]f they’re going to try to play character assassination on the victim, in an attempt to somehow justify or somehow argue for a manslaughter, it’s simply not *136 relevant. The allegation that we’re concerning ourselves is some alleged groping by the victim, I suppose on this girlfriend of Mr. Dressner’s that took place, by her own statement, more than two months prior to the murder. And, one, character evidence of the victim is not admissible in a criminal prosecution, unless and until the defense puts the State on notice that they intend to proceed under a self-defense theory, and then, it’s only admissible to go towards an overt hostile act which would then lead to the self-defense. Evidence of drug use and unsubstantiated other crimes or bad acts by the victims are intended for one purpose and one purpose only, that’s just to dirty up the victim, and under 404, it’s inadmissible. So, I’m moving in limine for an order of this Court to prohibit them from making any reference to these things in opening statement or questioning the witnesses, because it’s irrelevant and its highly prejudicial.
Thereafter, the district court permitted the defense to put their arguments on the record ex parte:
| ls[Defense counsel]: Judge, the information that we seek to present relative to the drugs, the sex, this is what was going on at this house. This is the contact that my client and his ex-girlfriend had with the victims. I don’t intend to sully the victim. These are the true facts of the case. My client was there. He would go there. They would provide him with drugs, alcohol and have these little sexual things that they would do. This is all in statements. This is not something that I’m making up....
The Court: Try to be as specific as you can.
[Defense counsel]: ... Our position is that this incident that happened between
Mr. Fasullo and Ms. Gilbert, that’s my client’s girlfriend, where she indicated that both Mr. Fasullo and Mrs. Fasullo attempted to have sex with her. She was squeezing — he was squeezing her breasts. Ms. Fasullo was rubbing her between her legs. This is all in her statement. Mr. Fasullo and Dustin got into a small altercation over that. Okay? He was very, very upset about that.
The Court: When was this?
[Defense counsel]: This happened according to our statement maybe two months prior to and they had been having some bad blood between them. So, you know, this could play into our defense as possibly a reason why he was angry with Mr. Fasullo and engaged into fisticuffs with Mr. Fasullo. All of this stuff goes to our defense here. This stuff is not just to sully anybody’s reputation or anything like that. These things [go] to the heart of our defense, the actions that these people engaged in with our clients and the position that my client took relative to some actions by both Mr. and Mrs. Fasullo.
The Court: Okay. Tell me again about the drug use.
[Defense counsel]: Basically they would go over there, and this is in Mrs. Fasul-lo’s statement also. She admits that they would go over and they would provide these people with marijuana, ecsta-cy. She was taking ecstacy. Mr. Fasul-lo was taking ecstacy.
The Court: That is generally that they were using drugs.
[Defense counsel]: Yeah. They would have these teenagers come over and they would have these parties with them. They would provide them with alcohol, drugs and the whole like. You can review her statement. It’s in there.
*137 The district court orally granted the State’s motion on both issues, reasoning:
With respect to the drug use, .... it’s got no probative value at all and clearly is prejudicial so I’m going to grant the State’s Motion in Limine on that issue.
114With respect to the manslaughter issue, as I understand the facts there may have been some type of relationship between Mr. Fasullo and the defendant’s girlfriend which took place two months prior to Mr. Fasullo’s murder. Clearly, I mean if we were talking about a week, maybe even outside of two weeks, then there could be a potential manslaughter defense. In this case clearly two months is far and away enough time for somebody’s blood — -for anybody’s blood to have cooled so I’m going to grant the State’s Motion in Limine on that issue as well.
Significantly, the district court limited its ruling to the guilt phase.
Defense counsel immediately gave notice of his intent to seek writs and a stay “because your ruling impacts the way I may or may not be able to delivery [sic] an opening statement to the jury....” The district court denied the stay, but gave the defense until 1:00 p.m. to file the emergency writ. Counsel informed the court he wished to reserve his right to make an opening statement following the Fifth Circuit’s ruling.[25] The defense filed a simultaneous writ application on the same issue in this Court and requested to delay giving opening statement pending resolution of the matter. Accordingly, the district court stayed the trial and sent the jury back to their hotel.
The following day, the Fifth Circuit ruled, granting the defense writ in part, denying it in part, and lifting the stay:
The evidence of the victims’ general drug use is admissible as a defense to the charged crime, as presented in the Defendant’s Ex Parte and Under Seal Statement of Facts. Under La.C.E. art. 403, the probative value substantially outweighs its prejudicial effect. Therefore, we reverse the granting of the motion in limine on that issue. However, the Defendant has failed to show the relevancy of the evidence related to the illicit behavior between the Defendant’s girlfriend and victims, or that the probative value of that evidence outweighs its prejudicial effect. See: C.E. art. 403. Therefore, we find the trial judge did not err in granting the motion in limine with regard to this issue.
State v. Dressner, 04-0581 (La.App. 5 Cir. 5/20/04).
| u/This Court denied the stay and denied defendant’s writ, ruling: “If defendant is found guility [sic] of first degree murder, the issue of the admissibility of the evidence at the penalty phase of the proceeding may be reurged.” State v. Dressner, 04-1199 (La.5/21/04), 874 So.2d 845 (Tray-lor, J., “would deny the stay and the writ”).[26]
A. Right to Present a Defense
The Sixth and Fourteenth Amendments to the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee the criminally accused a meaningful opportunity to present a complete defense. State v. Blank, 04-0204, p. 49 (La.4/11/07), 955 So.2d 90, 130, *138 cert. denied, 552 U.S. 994, 128 S.Ct. 494, 169 L.Ed.2d 346 (2007). Under La.Code Evid. art. 403, relevant evidence “may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.... ” A district court judge enjoys broad discretion in admitting or excluding evidence on relevancy grounds. State v. Miles, 402 So.2d 644, 647 (La.1981).
As a general matter, La.Code Evid. art. 404(A) provides evidence of a “person’s character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion .... ” However, an exception to the general inadmissibility of evidence concerning the victim’s dangerous character arises under La.Code Crim. Proc. art. 404(A)(2) when there is evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense. Consequently, evidence of the victim’s character is not appropriate, except when the defendant is claiming self-defense against an aggressor victim, which was not the case herein. Paul Fasullo was awakened from sleep only moments before he was stabbed, and significantly, he did 116not incur any defensive wounds, both of which facts strongly negate aggression on the part of the victim.
In this ease, the rulings of the district court, the Fifth Circuit, as well as this Court did not squelch a viable defense.[27] Manslaughter, as it relates to the defendant’s theory of the case, is a homicide, which would either be first or second-degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his cool reflection and self-control. La.Rev.Stat. § 14:31(A)(1). Nothing in the instant record suggests defendant’s homicidal actions were the result of immediate “provocation sufficient to deprive an average person of his self-control and cool reflection.”
Additionally, regarding those mitigating circumstances, which reduce the grade of a homicide from murder to manslaughter, the defense had the burden of proof by a preponderance of the evidence. State v. Lombard, 486 So.2d 106, 110-11 (La.1986). Notwithstanding defendant admitted to inflicting the lethal stab wound, the defense failed to demonstrate a sufficient level of provocation stemming from the victims’ alleged groping of his girlfriend could have smoldered within defendant for over two months since the event allegedly occurred. As the district court appropriately noted, two months exceeds a reasonable time for a person’s temper to have calmed. State v. Gant, 06-232, p. 10 (La.App. 5 Cir. 9/26/06), 942 So.2d 1099, 1113 (one week sufficient time for blood to cool), writ denied, 06-2529 (La.5/4/07), 956 So.2d 599; State v. Crochet, 96-1666, p. 11 (La.App. 1 Cir. 5/9/97), 693 So.2d 1300, 1307 (two days sufficient time for blood to cool), writ denied, 97-1547 (La.11/21/97), 703 So.2d 1305. Under these circumstances, defendant failed to carry his burden of proof such evidence was even relevant much less mitigating. La.Code Evid. arts. 402 & 403. We find no abuse of the district court’s discretion in granting the State’s motion in limine, and accordingly, the district court did not deprive defendant of his fundamental right to present a defense.
B. Right to Confront Witnesses
Defendant further complains the ’ district court’s ruling impinged on his *139 Sixth Amendment right to confront the witness against him, namely, Shannon Fa-sullo. In defendant’s view, trial counsel should have been able to explore “what, if anything, was said that night on the Fasul-los’ doorstep concerning the subject” and by barring the subject of sexual misconduct, the district court limited the defense’s ability to reveal a potential source of Shannon’s bias.
“The partiality of a witness is subject to exploration at trial, and is ‘always relevant as discrediting the witness and affecting the weight of his testimony.’” Davis v. Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974)(quoting 3A J. Wigmore, Evidence § 940, p. 775 (Chadbourn rev.1970)). In the present case, the jury heard Shannon Fasullo’s acknowledgment of how she came to meet defendant.[28] She further related, on the night of the murder when she opened the door and spoke briefly with defendant, his demeanor was calm, and while she could not invite him in because of the late hour, defendant did not appear to be agitated.
Moreover, the defense was given full cross-examination of Shannon Fasullo, and the jury apparently credited her testimony as credible and impartial. Clearly, the singular source of Shannon’s bias, if any, against defendant was the fact he stabbed | isher husband to death and tried with all his might to kill her the same way, and not because she and her husband once engaged in some alleged sexual misconduct with defendant’s girlfriend. There was no reason to expose the jury to the speculative allegation something sexual passed between the victims and defendant’s girlfriend to demonstrate bias on Shannon’s part arising from an alleged sexual encounter two months earlier. Therefore, we find the district court appropriately limited the irrelevant testimony the defense sought to introduce, La.Code Evid. art. 402, and did not deprive defendant of his right to confront Shannon Fasullo. Accordingly, this assignment fails on the merits.

Exclusion of Evidence of Inconsistent Prosecutions

Defendant complains in his third assignment of error the inconsistent prosecutions advanced in the separate trials of defendant and Kellen Parker and the district court’s ruling the defense could not bring these inconsistencies to the jury’s attention violated his due process rights and his right to present a complete defense.
In pretrial motions captioned, “Motion to Bar Inherently Unfair Inconsistent Government Theories” and “Motion to Use Prior Government Statements as Evidence,” the defense sought “to bar the State from changing its story” and quoted snippets from the prosecutor’s rebuttal argument in Kellen Parker’s trial. Following a hearing held on May 14, 2004, the district court ruled the motion premature:
I sat through Mr. Parker’s trial and that trial, the entire time, my thinking was that Mr. Dressner was the more culpable of the two; so ... I don’t know that it would be necessarily inconsistent — I mean I think what y’all did in your motions is pluck out a few sentences from the State’s attorneys to make it look like Mr. Parker, like they allege that Mr. Parker was more culpable than Mr. Dressner — which frankly the flavor *140 of the whole week we sat here was not the case, in my opinion....
[[Image here]]
I sat through that first trial and I don’t believe that they, that this will be an inconsistent theory of the case.
|iaThe issue resurfaced during the State’s penalty phase closing argument. Counsel interrupted when the prosecutor reminded the jurors “[yjou’re here because he [Dustin Dressner] stabbed Paul Fasullo in the chest.” Outside the presence of the jury, counsel proffered transcript pages from the State’s closing argument in Parker’s trial as support for his inconsistent theories motion.
Defendant now claims he should have been able to introduce closing argument made at the penalty phase of Parker’s trial, which, in defendant’s view, showed the State argued Parker inflicted the fatal stab wound into Paul Fasullo’s chest, specifically: “[g]ive [Parker] the same mercy that he showed that little child when he butchered her father [Paul Fasullo] in front of her very eyes.” The State’s brief counters the prosecutor in Parker’s case never told the jury Kellen Parker inflicted the fatal stab wound to Paul Fasullo’s chest.
As a general matter, due process forbids a state from employing inconsistent and irreconcilable theories to secure convictions against individuals for the same offenses arising from the same event. Smith v. Groose, 205 F.3d 1045, 1048-49 (8th Cir.2000)(convictions of accomplices in a murder/robbery were obtained at separate trials through diametrically opposed testimony from a third participant; such manipulation of evidence rendered trial fundamentally unfair and required reversal), cert. denied, 581 U.S. 985, 121 S.Ct. 441, 148 L.Ed.2d 446 (2000); compare Nichols v. Scott, 69 F.3d 1255, 1268-72 (5th Cir.1995)(guilty plea of one co-defendant does not preclude murder prosecution of the other when it could not be determined whose gun caused the fatal wound), cert. denied, 518 U.S. 1022, 116 S.Ct. 2559, 135 L.Ed.2d 1076 (1996).
This Court has previously acknowledged “ ‘[in] a situation [where] the prosecutor has adopted such a fundamentally inconsistent position in the separate |2ntrials of two co-perpetrators ... basic fairness might require the trial court to permit the exposure of the inconsistent positions.’ ” State v. Lavalais, 95-0320, p. 13 (La.11/25/96), 685 So.2d 1048, 1056 (quoting State v. Wingo, 457 So.2d 1159, 1166 (La.1984)), cert. denied, 522 U.S. 825, 118 S.Ct. 85, 139 L.Ed.2d 42 (1997). Accordingly, “when no new significant evidence comes to light a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime.” Thompson v. Calderon, 120 F.3d 1045, 1058 (9th Cir.1997). However, in both Wingo and Lavalais, this Court distinguished between the state’s adoption of mutually exclusive theories of guilt in successive trials of co-defendants and the state’s “emphasis on the facts relating to culpability of the particular defendant on trial.” Wingo, 457 So.2d at 1166. In the latter case, a due process violation does not occur when “[e]ach defendant had attempted to shift culpability to the other, and the prosecutor in each case simply pointed out to the jury the evidence reflecting on the culpability of the defendant on trial and the reasonable inferences drawn from the evidence.” Id.
In support of his argument, defendant cites the United States Supreme Court’s recent decision in Bradshaw v. Stumpf 545 U.S. 175, 125 S.Ct. 2398, 162 L.Ed.2d 143 (2005). However, the Supreme Court’s reasoning with respect to princi *141 pals to capital murder aligns precisely with this Court’s holding in State v. Anthony, 98-0406, pp. 11-14 (La.4/11/00), 776 So.2d 376, 385-87,[29] in which this Court held the state is not required to show defendant actually pulled the trigger in order to sentence him to death in a first-degree murder prosecution. Id. Instead, to carry its burden of proof successfully, the state must prove defendant acted in concert with his co-)perpetrators,2i defendant had the specific intent to kill, and one of the aggravating elements enumerated in the first-degree murder statute was present. Id.
Notwithstanding defendant’s argument to the contrary, nothing in the statements reproduced, sn/pra, demonstrates inconsistent theories of the prosecution. The testimony and evidence supported both defendant and Kellen Parker were armed with knives and both actively participated in the savage attack on Paul and Shannon Fasul-lo. Defendant admitted in his statement he stabbed Paul Fasullo in the chest. Dr. Garcia testified the only fatal wound Paul Fasullo suffered was the stab wound to the chest; however, she did note Paul Fasullo concurrently sustained other non-lethal stab wounds to the neck and blunt force injuries splitting his head, the source of which could not be determined. In addition, based on the testimony of the living victim, Shannon Fasullo, the jury learned both defendants were wielding their knives repeatedly in attacking her. Nothing in the prosecutor’s argument in Kellen Parker’s trial exonerated or exculpated defendant, as the two were principals to the same crimes. There is nothing “inherently irreconcilable” about arguing each perpetrator’s specific intent in his separate trial. State v. Scott, 04-1312, pp. 81-83 (La.1/19/06), 921 So.2d 904, 957-58[30] (distinguishing between the state’s adoption of mutually exclusive theories of guilt in successive trials of co-defendants and the state’s emphasis on the facts relating to the culpability of the particular defendant on trial); see also State v. Holmes, 06-2988 (La.12/2/08), 5 So.3d 42 (rejecting same due process claim the state presented alternate theory of the crime at capital trial of her codefendant), cert. denied, — U.S. -, 130 S.Ct. 70, 175 L.Ed.2d 233 (2009). Therefore, we find defendant fails to demonstrate inconsistent theories of prosecution and find no merit to defendant’s argument.

122Exclusion of Evidence of Defendant’s Diminished Capacity

In his fourth assigned error, defendant argues the district court’s refusal to allow defendant to introduce evidence that his diminished capacity negated the voluntariness of his confession denied him the right to present a complete defense during the guilt phase of trial.
At the outset of this discussion, we note the most contentious pretrial issue was the State’s pursuit of defendant’s school and mental health records and the defense’s efforts to prevent the State from succeeding, even as the defense advanced the notion of defendant’s diminished capacity at every opportunity, notwithstanding defendant had not entered a dual plea of not guilty and not guilty by reason of insanity. As early as February 23, 2003, the State anticipated the defense theory and so issued three subpoenas duces tecum for records from Jefferson Parish School Board, DePaul’s Hospital, and Methodist Behavioral Resources. Immediately, defense counsel questioned whether the State was *142 entitled to these records. Ultimately, the district court issued the State’s subpoenas, and the records were produced under seal. As trial approached, the State argued for review of the records with persistent claims of defense “sandbagging.” The district court acknowledged the State’s frustration and agreed “that appears to be what’s happening.”
At a status conference held on May 7, 2004, the defense filed a written “Notice of Defense Based Upon Mental Condition Pursuant to La.C.Cr.P. art. 726 A,” indicating its intent to raise defendant’s mental condition as a defense. In his filing, defendant contended he should be entitled to introduce testimony relating to a mental disease, defect or other condition bearing upon the issue of whether he had the specific intent required for the offense charged, despite the fact he had not entered a dual plea of not guilty and not guilty by reason of insanity. The State objected to | ^defendant’s notice, arguing the defendant was prohibited by law from claiming such a defense unless he entered the dual plea of not guilty and not guilty by reason of insanity. See La. Code Crim. Proc. art. 651. Defense counsel then put all on notice the defense position was La. Code Crim. Proc. art. 651 was unconstitutional. Consequently, the district court issued an order for the defense to turn over all records relied upon by its mental health expert, Dr. Justin Wiley, by 12:00 p.m. on the following day, May 8, 2004. The Fifth Circuit vacated the district court’s ruling, but further ordered the defense to supplement its writ application to comply with the Uniform Rules, Court of Appeal, Rule 4-5, no later than 10:00 a.m. on May 10, 2004. State v. Dressner, 04-0519 (La.App. 5 Cir. 5/7/04).
Then, on May 10, 2004, the district court held a hearing on the subject and again ordered the documents, previously sealed, to be unsealed and released to the State because the defense is “opening the door to all of the documents.” The defense again sought writs. Consequently, the district court stayed its order pending resolution of defendant’s writ to the court of appeal.
Simultaneously, the district court issued a written order on the subject of defendant’s request to admit evidence of diminished capacity at the guilt phase of his trial. Noting the defense had not served the Louisiana Attorney General with his threatened constitutional challenge to La. Code Crim. Proc. art. 651, the district court denied defendant’s request as premature.
The Fifth Circuit granted defendant’s writ with the following order:
Considering the trial court’s May 10, 2004 ruling denying the defendant’s request to admit evidence of the defendant’s diminished capacity at the guilt phase of the trial, no basis exists for the document production ordered by the trial court on May 7, 2004. Accordingly, we grant the relator’s writ application and vacate the trial court’s order.
State v. Dressner, 04-0519 (La.App. 5 Cir. 5/10/04). The State sought review in this Court, which a majority of the Court denied, but three justices would have granted:
Writ denied. In the event that the defendant is found guilty of first degree murder, the state may re-raise prior to the penalty phase the issue whether the defense must provide discovery of documents regarding the defendant’s mental health.
VICTORY, J., would grant the writ.
KNOLL, J., would grant the writ for the reasons assigned by WEIMER, J.
WEIMER, J., would grant the writ. There is no showing that the trial court *143 abused its great discretion. We must yield to the trial court’s decision that the defendant, who has repeatedly put his allegedly diminished mental capacity at issue, must provide the State with materials his proposed expert witness has reviewed.
State v. Dressner, 04-1158 (La.5/14/04), 874 So.2d 157.
At the May 14, 2004 status conference, the defense acknowledged it served the Attorney General’s Office with its constitutional challenge. The State informed the court the AG’s Office did not intend to respond to the defense’s challenge. Accordingly, the district court clarified the defense would be precluded from raising the issue of mental condition at the guilt phase. The State reiterated it would again seek production of the sealed documents in the event of a penalty phase, when the issue could resurface.
During a status hearing on May 17, 2004, the defense indicated it might bring in the issue of diminished capacity at the guilt phase in conjunction with the volun-tariness of defendant’s confession and might introduce evidence surrounding the taking of that confession in which defendant’s mental state could pertain. The State again sought review in this Court of the Fifth Circuit’s decision, and this Court denied the stay and denied the writ. State v. Dressner, 04-1202 (La.5/21/04), 874 So.2d 845 (Traylor and Knoll, JJ., would grant the writ).
| ¡^Before opening statements in the guilt phase, the parties argued defendant’s motion for admission of evidence concerning the circumstances surrounding the making of his statements to the police. The district court ruled:
The court has previously ruled that evidence of the defendant’s mental condition in the guilt phase of the trial is not admissible since the defendant did not plead not guilty by reason of insanity....
[[Image here]]
In addition, I will note that having sat through ... basically the facts in this case against State versus Kellen Parker I’m really not sure how much weight the statement — the defendant’s statement has to present. There’s plenty of evidence outside of the statement that goes to the defendant’s guilt in proving DNA and so on and so forth if my memory serves. So, for all of those reasons the court is going [to] deny the defendant’s motion.
The district court failed to see any prejudice to defendant by the ruling in the face of “the total overwhelming evidence of the defendant’s guilt outside of the confession.” Thereafter, the district court issued its written “Order and Reasons”:
This Court denies defendant’s motion pursuant to the Fifth Circuit’s reasoning set forth in State v. Hayes, 806 So.2d 816, 825-26 (La.App. 5 Cir. 12/26/01). In Hayes, just as [in] this case, the trial court had denied the defendant’s motion to suppress his confession. The defendant then attempted to introduce the testimony of Dr. Salcedo regarding the defendant’s diminished capacity to show the alleged involuntary nature of the defendant’s statement. The Fifth Circuit upheld the trial court’s decision to exclude Dr. Salcedo’s testimony.
Nevertheless, at the penalty phase, the jury heard from two defense expert witnesses, who testified defendant suffered from bipolar disorder, Attention Deficit Hyperactivity Disorder (ADHD), and poly-substance abuse disorder.
A. Prejudice to the Defense.
It is well-settled, “[w]hen a defendant is tried upon a plea of ‘not guilty’, *144 evidence of insanity or mental defect at the time of the offense shall not be admissible.” La.Code Crim. Proc. art. 651; State v. Holmes, 06-2988, p. 46 (La.12/2/08), 5 So.3d 42, 74, cert. denied, — U.S. --, 130 S.Ct. 70, 175 L.Ed.2d 233 (2009). Under La.Rev.Stat. § 14:14, Louisiana’s codification of the M’Naughten | 2rvRule,[31] an offender is exempt from criminal responsibility only if he is incapable of distinguishing between right and wrong with reference to the conduct in question. Thus, Louisiana does not recognize the doctrine of diminished capacity absent a dual plea of not guilty and not guilty by reason of insanity. State v. Deboue, 552 So.2d 355, 366 (La.1989), cert. denied, 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 174 (1990); State v. Nelson, 459 So.2d 510, 513 (La.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 322 (1985); State v. Lecompte, 371 So.2d 239, 243 (La.1978). Evidence of a mental defect, which does not meet the M’Naughten definition of insanity, therefore, cannot negate a specific intent to commit a crime and reduce the degree of the offense. Holmes, 06-2988 at p. 46, 5 So.3d at 74. Consequently, in crimes requiring specific intent, diminished mental capacity is not a recognized defense. Lecompte, 371 So.2d at 243.
B. Introduction of Error into the Sentencing Determination
La.Code Crim. Proc. art. 703(G) expressly provides, when “a ruling on a motion to suppress a confession or statement is adverse to the defendant, the state shall be required, prior to presenting the confession or statement to the jury, to introduce evidence concerning the circumstances surrounding the making of the confession or statement for the purpose of enabling the jury to determine the weight to be given the confession or statement.” See State v. Van Winkle, 93-0843, p. 22 (La.App. 5 Cir. 3/16/94), 635 So.2d 1177, 1190 (“The predicate [for assessing the evidentiary weight of a statement] should not provide another opportunity to attack the admissibility of the statement.”), rev’d 94-0947, p. 8 (La.6/30/95), 658 So.2d 198, 203 (“Ms. Van Winkle argues the District Court erred in prohibiting her from presenting evidence as to her mental state when she gave the various statements.... [I]f |⅞7... the statements are used, then the defendant is entitled to introduce ‘evidence concerning the circumstances surrounding the making of the confession or statement for the purpose of enabling the jury to determine the weight to be given to the confession or statement.’ ”)(quoting La. Code Crim. Proc. art. 703(G)). See Crane v. Kentucky, 476 U.S. 683, 689, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986)(“[R]e-gardless of whether the defendant marshaled the same evidence earlier in support of an unsuccessful motion to suppress, and entirely independent of any question of voluntariness, a defendant’s case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility.”); see also State v. Williams, 01-1650, p. 8 (La.11/1/02), 831 So.2d 835, 843[32] (Statutory rule of La.Code Crim. Proc. art. 703(A), which permits the defendant to introduce evidence at trial regarding the circumstances surrounding his confession, “has its underpinnings in the Due Process Clause and it necessarily operates independently of any credibility determinations the trial court may have made in ruling on the voluntariness of a statement as a matter of law.”)(citing Crane v. Kentucky, 476 *145 U.S. 683, 689, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986)).
However, in Holmes, this Court clearly held the erroneous exclusion of evidence of diminished capacity, which may vitiate the voluntariness of the defendant’s confession, is nevertheless subject to the harmless error standard of review. Holmes, 06-2988 at 48, 5 So.3d at 76. Employing that standard in the present case, a review of the record demonstrates the State presented overwhelming evidence of defendant’s guilt, including the testimony of Troy Arnaud, who told the jury about defendant’s planning before these crimes and how defendant obtained the two knives to fulfill his purpose from the apartment of Troy’s female companion; the ^testimony of Shannon Fasullo, who told the jury she saw defendant struggling with her husband over a knife and then, along with the help of Kellen Parker, turned his deadly knife attack toward her; Shannon’s positive identification of defendant as one of the perpetrators; and her identification of defendant’s voice on the 911 tape as saying, “this bitch won’t die.” Further incriminating was the discovery of Shannon’s blood on defendant’s clothing and in his car. Finally, unless defendant had been in a hypomanic state or drug induced psychosis at the time he confessed (and there was no evidence of either condition at the time), his mental disorders were not such they would have precluded him from giving a knowing and voluntary statement.
Under these circumstances, even assuming the district court should have admitted evidence of defendant’s mental deficiency to help explain “why someone in his state of diminished mental capacity would be more likely to provide detectives with an involuntary or unreliable statement than the average person who is being interrogated by the police,” we find exclusion of the evidence was harmless, and these arguments fail on the merits.

Penalty Phase

Heinous, Atrocious, and Cruel Aggravating Circumstances

In his fourteenth assignment of error, defendant suggests the record does not support the finding of the heinous, atrocious, and cruel aggravating circumstance, and thus, defendant asks his death penalty be reversed.[33]
| ¿qFor a crime to have been committed in an especially heinous or cruel manner, the evidence must support a finding of torture or pitiless infliction of unnecessary pain. State v. Hoffman, 98-3118, pp. 33-34 (La.4/11/00), 768 So.2d 542, 574;[34] State v. Hamilton, 92-1919, pp. 14-15 (La.9/5/96), 681 So.2d 1217, 1226, cert. denied, 520 U.S. 1216, 117 S.Ct. 1705, 137 L.Ed.2d 830 (1997); State v. Eaton, 524 So.2d 1194, 1211 (La.1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 818, 102 L.Ed.2d 807(1989); State v. Brogdon, 457 *146 So.2d 616, 630 (La.1984), cert. denied, 471 U.S. 111, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985). To support a finding of heinousness, this Court has also held the murder must be one in which the death was particularly painful and one carried out in an inhuman manner, so that the victim experienced great pain and was aware of his impending death. State v. Castleberry, 98-1388, p. 31 (La.4/13/99), 758 So.2d 749, 774 (finding heinous nature of crime supported “given that defendant forced the victim to look at him before beating him about the head with an iron skillet with such force that the skillet broke and then, finding the victim still alive, smothered him to death, all while the victim was bound and gagged”), cert. denied, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999); Eaton, 524 So.2d at 1211. This Court considers awareness of impending doom relevant in a finding of heinousness. State v. Weary, 03-3067, pp. 24-25 (La.4/24/06), 931 So.2d 297, 314 (sufficient evidence of heinousness for victim of continuous vicious beatings as he was driven from place to place; witness testified victim attempted to escape and victim moaned throughout ordeal before ultimately succumbing to injuries incurred when defendant ran over the victim with his own car), cert. denied, 549 U.S. 1062, 127 S.Ct. 682, 166 L.Ed.2d 531 (2006); State v. Manning, 03-1982, pp. 70-72 (La.10/19/04), 885 So.2d 1044, 1104-05 (“Cases involving stabbings in which this Court laphas determined that the offense had been committed in an especially heinous and cruel manner share the common theme that the victim died slowly.”), cert. denied, 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005).
In the present case, the district court instructed the jurors with the following limiting instruction: “To find that an offense was committed in an especially heinous, atrocious or cruel manner, Louisiana jurisprudence holds that there must be evidence [from which you can find beyond a reasonable doubt there was] torture or the pitiless infliction of unnecessary pain and suffering” on the victim.[35] Using this guidance, the jurors were able to rely upon their common sense and life experiences to assess the pain Paul and Shannon Fasullo[36] experienced as they were *147 stabbed repeatedly by |81 defendant and Kellen Parker.[37] The district court’s limiting instruction met the strictures of Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), and the jury was educated on the narrow construction given to the terms “heinous, atrocious or cruel manner.”
To assess the sufficiency of the State’s evidence in support of the aggravating circumstance of heinousness, the jury was guided by the testimony of Dr. Susan Garcia, the forensic pathologist, who conducted the autopsy on Paul Fasullo. Dr. Garcia opined Paul died of a single stab wound to the chest, which hit the lung, pulmonary artery, and the aorta. She noted Paul incurred numerous non-lethal injuries, including a stab wound to the neck, which was not life-threatening because it did not hit the jugular vein. Additionally, the massive head injuries, which appeared to split the victim’s head open, were the result of blunt force trauma, and in the doctor’s opinion, those injuries “look worse than they really are.” The jury had the benefit of photographic evidence depicting Paul’s injuries, both at the scene and during autopsy. Dr. Garcia concluded Paul’s death was not an instantaneous one and it probably took anywhere from three to five minutes for him to lose consciousness.
Additionally, the jurors also learned this attack was so forceful the blade of one of the knives broke away from its handle during the melee and was discovered by EMT Theriot when he removed Shannon Fasullo’s nearly lifeless body from the scene. EMT Theriot described Shannon lying on the floor “completely covered with wounds” and with blood all over her. He assessed she was already going into shock because she had vomited on the bathroom floor, one of the initial indicators of shock. | ^Similarly, Deputy Pellegrin testified, from his observations, the female was not in good shape and he thought she would die. Shannon was having trouble breathing and had incurred more stab wounds than he could count. The jury also viewed photographic evidence of the injuries defendant inflicted on victim, Shannon Fasul-lo.
Further exacerbating the cruelty and brazenness of defendant’s attack is the fact he knowingly killed Paul and nearly killed Shannon in front of their two-year-old baby, Samantha. First responders described the child as covered in her parents’ blood, crying uncontrollably. The jury saw pictures of baby Samantha, capturing for all posterity the obviously frightened and despondent look on her face.
Perhaps the most horrific piece of evidence the State presented to underscore the heinousness of defendant’s crime was the tape of the 911 call Shannon was able to make while the killers were focusing their murderous attention on Paul. Shan *148 non fortuitously threw the cordless phone under the bed as the killers turned their knives and attention toward her. From that point on, 911 recorded the pain and agony of the knife attack defendant orchestrated, which the jury could hear in blood-curdling clarity. Shannon’s screams and her pleas of “why are you doing this” and “please don’t kill my baby” can all be deciphered from the tape, along with Samantha’s terrified wails.
The State’s rebuttal argument at the penalty phase drove home the prosecution’s theme of heinousness:
[0]ne of the aggravating circumstances is that this was perpetrated in a cruel, heinous, or atrocious manner....
Dr. Garcia told you-all that Paul would have been conscious for at least three minutes after receiving the [mortal] stab wound. I have my watch set to three minutes, and let’s listen to what Paul heard in the last three minutes of his life.
(Playing 9-1-1 audiotape in open court.)
Three minutes. A lot can happen in three minutes. Paul had to listen to the tortured screams of his wife, the uncon-solable [wailing] of his | .¡¡¡daughter, and he’s unable to help. He had to sit there helpless, helpless to come to the aid of the two people he loved most in life.
* * ⅜
Paul had a bare minimum, three minutes. In addition to hearing what he heard, what was he thinking? He’ll never get to see Sam make her First Communion or Confirmation, her first date. He won’t get to say, yes, to the boy that captures her heart when he comes to ask for her hand. He won’t get to walk her down the aisle. He won’t get to hold his grandchildren. And he won’t get to grow old.
Why? And for what? We know the how, and I think you know what to do. Go in there, search your souls, and I think you already know that Dustin Dressner deserves to die.
The facts of this case are not unlike others in which this Court has found no error in the jury’s determination the offense was committed in an especially heinous, atrocious, or cruel manner. See State v. Anderson, 06-2987, pp. 45-52 (La.9/9/08), 996 So.2d 973, 1006-10 (eighty-five-year-old female sustained ten major stab wounds, left on her kitchen floor to watch defendant steal valuables from her home as life oozed from her), cert. denied, - U.S. -, 129 S.Ct. 1906, 173 L.Ed.2d 1057 (2009); Manning, 03-1982 at pp. 68-72, 885 So.2d at 1103-06 (finding heinousness where defendant abducted sixty-two-year-old victim and forced her to drive him seventeen miles to a remote spot where he severely beat her about the face and chest before slashing her neck, severing her airway; estimated twenty to sixty minutes to die); State v. Legrand, 02-1462 (La.12/3/03), 864 So.2d 89 (victim stabbed over twenty-five times with a variety of weapons), cert. denied, 544 U.S. 947, 125 S.Ct. 1692, 161 L.Ed.2d 523 (2005); State v. Rault, 445 So.2d 1203, 1219 (La.1984)(vietim raped, strangled, stabbed in the neck, and shot twice; specifically noting victim’s intense mental, as well as physical, pain during the ordeal), cert. denied, 469 U.S. 873, 105 S.Ct. 225, 83 L.Ed.2d 154 (1984); State v. Flowers, 441 So.2d 707, 718 (La.1983)(seventy-year-old widow severely beaten, raped and strangled in her home), cert. denied, 466 U.S. 945, 104 S.Ct. 1931, 80 L.Ed.2d 476 (1984); State v. Willie, 436 So.2d 553, 556-57 (La.1983)(victim taken blindfolded and naked to a |34remote area where she was tied spread eagle, raped, and had her throat repeatedly slashed), cert. denied,
*149 465 U.S. 1051, 104 S.Ct. 1827, 79 L.Ed.2d 723 (1983); State v. Taylor, 422 So.2d 109, 117-18 (La.l982)(victim stabbed over twenty times; slow manner of death), cert, denied, 460 U.S. 1103, 103 S.Ct. 1803, 76 L.Ed.2d 367 (1983); State v. Moore, 414 So.2d 340, 348 (La.l982)(victim received thirteen stab wounds and died slowly “with awareness of her impending death” in presence of four-month-old daughter), ceri. denied, 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1983). Accordingly, we find the evidence sufficient for a rational juror to find beyond a reasonable doubt the defendant subjected Paul Fasullo to the pitiless infliction of unnecessary pain prior to death. We further find the serious physical, mental, and emotional abuse, which Paul Fasullo had to have suffered moments before death, amounts to torture under our law and defendant carried out Paul’s death in a particularly inhumane manner. Consequently, the aggravating circumstance of heinousness is more than sufficiently supported by the record evidence. This assignment of error lacks merit.

Specific Intent to Kill More than One Person

In his eighteenth assignment of error, defendant asserts the State presented insufficient evidence of specific intent to kill more'than one person.
La.Code Crim. Proc. art. 905.4(A)(4) authorizes capital punishment in cases in which the offender knowingly created a risk of death or great bodily harm to more than one person. In his statement, defendant confessed to inflicting the lethal stab wound ending Paul Fasullo’s life, but he claimed intoxicated memory loss when it came to the multiple stab wounds inflicted upon Shannon Fasullo.
However, the instant record is replete with evidence defendant knowingly created a risk of death or great bodily injury to more than one person, as demonstrated |SBby his elaborate advanced planning. First, defendant recruited co-defendant, Kellen Parker, to assist in the Fasullo home invasion because he knew two adults would be present at 5313 Tulip Court. Earlier that day, defendant took not one, but two knives from Amy Rome’s kitchen drawer, so he could arm not only himself, but also arm his confederate. Finally, and most telling, the 911 tape includes defendant shouting, “help me kill this bitch, this bitch won’t die, the police are on the way,” suggesting he was having trouble fulfilling his mission as to Shannon Fasullo. The fact defendant succeeded in killing only one of his victims does not render the evidence in support of La.Code Crim. Proc. art. 905.4(A)(4) any less sufficient. We find the aggravating circumstance defendant knowingly created a risk of death or great bodily harm to both Paul and Shannon Fasullo is thoroughly supported by the record, and this argument as well fails on the merits.

CAPITAL SENTENCE REVIEW

Under La.Code Crim. Proc. art. 905.9 and La.S.Ct.R. XXVIII, this Court reviews every sentence of death imposed by a Louisiana court to determine if it is constitutionally excessive. In making this determination, the Court considers whether the jury imposed the sentence under the influence of passion, prejudice, or other arbitrary factors; whether the evidence supports the jury’s findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
The Department of Public Safety and Correction submitted a Capital Sentence Investigation Report (“CSIR”). See La. S.Ct.R. XXVIII § 3(b). In addition, the district court judge filed the Uniform Capital Sentence Report (“UCSR”) required *150 by La.S.Ct.R. XXVIII § 3(a). The State and the defense each filed a Sentence Review Memorandum.
| family. Those documents, along with the penalty phase testimony of defendant’s relatives, indicate defendant is a Caucasian male, born on November 30, 1983, in Mar-rero, Louisiana, to the marital union of Allan E. and Shirlene Dressner.[38] The Dressners were married in 1981. Defendant has one brother, Allan M. Dressner, who is eighteen months older than defendant. Both of his parents testified defendant was born blue, indicating oxygen deprivation at birth, and had to spend the first three days of his life in neo-natal ICU.[39] His father described him as a sensitive child growing up, but his problems with other children began in elementary school when kids would pick on defendant because of his small size.
Defendant’s brother described a normal, middle-class childhood: he and defendant rode bikes after school, both played ball for Westwego Warriors baseball team, and they built a tree house. Allan described his brother as being very athletic and helpful around the house.
Education. Defendant attended West-wego Elementary School followed by Wor-ley Junior High School. According to his brother, around the age of thirteen, defendant started hanging out with the “worst people in school.” Defendant dropped out of school in the ninth grade, and his brother recalled defendant was a below average “D” student.
Mental. During his penalty phase testimony, defendant’s brother, Allan, described the childhood he and defendant enjoyed as “pretty normal” and their parents did not deny them anything. Yet, Allan perceived a change in his brother when he started hanging around with the wrong crowd. Defendant had a bad temper | S7and, if he did not get his way, sometimes he would have a temper tantrum. Allan recalled his brother started wearing different clothing and became increasingly more disobedient to their parents and rebellious. Allan described Dustin as having a problem with authority and with following rules. Defendant is an attention seeker; arrogant; cocky; boastful; very bright; very articulate; very manipulative; schemer.
The defense called two mental health experts at the penalty phase: Dr. Justin Wiley, a clinical psychologist,[40] and Sanket A. Vyas, M.D., a forensic psychiatrist.[41] Dr. Wiley conducted a mental status examination and reviewed defendant’s records, but did not perform any testing on defendant. Wiley consulted two physicians regarding defendant, and using the DSM-IV profile, he diagnosed defendant with Bipolar Affective Disorder II, polysubstance abuse and dependency, and a history of Attention Deficit Hyperactivity Disorder *151 (ADHD). Defendant’s previous court-ordered testing revealed a full scale IQ of 79.[42] Dr. Vyas, whose testimony dovetailed Dr. Wiley’s, came up with the same diagnosis of defendant.
Dr. Wiley found significant the history of mental illness in the Dressner family. Defendant’s paternal uncle, Eric, is depressed and sometimes suicidal; defendant’s father was on Xanax for anxiety at the time of trial; Housand, defendant’s paternal grandmother, tried twice to commit suicide and suffered from paranoid schizophrenia; defendant’s mother suffered from extreme depression when defendant’s brother was Inborn and has panic disorder. In Dr. Wiley’s opinion, a huge genetic component drives defendant’s disorder.
Defendant suffered head trauma at the age of six or seven when he fell from a tree house and had semi-paralysis for twenty minutes. The emergency room did not x-ray the brain, only defendant’s limbs. As noted above, defendant also suffers from ADHD, which was exacerbated at the age of eleven, when defendant’s polysub-stanee abuse began.
Defendant was previously admitted to Methodist Pavilion Hospital, an -inpatient psychiatric facility. After expulsion from that facility, defendant subsequently obtained intensive outpatient treatment for substance abuse at DePaul Psychiatric Hospital.
Dr. Wiley opined defendant is not mentally ill, he has some responsibility, but he refused the help provided him. Prescriptions such as Lithium and Atarol would have helped manage defendant’s problems, but he elected not to take his prescribed medications. Dr. Vyas concurred defendant was too obstinate to take his medicine for bipolar disorder and ADHD, both of which mental conditions are highly treatable.
Dr. Vyas opined defendant was not having a depressive episode when the crime occurred; rather, he was having a hypo-manic episode. From what defendant told Dr. Vyas, when everything started happening, defendant experienced “a, kind of, force that he was just going along with, that he just kept getting revved up and amped up from one thing that happened to another,” a “very high arousal; there was a lot of excitement going on.” Nevertheless, the expert concluded defendant understood the criminality of his conduct.
Social/Employment. Defendant has never married and has no children. His employment history was provided by his brother, who indicated defendant was | ^employed by McDonald’s at the age of eighteen. No other work history is known. Defendant never served in the military.
Criminal history. Defendant’s criminal history began when he was a juvenile. On August 13,1997, when defendant was fourteen years of age, he was adjudicated delinquent on the charge of simple robbery. The period of supervision ended on August 13, 1999. On June 27, 2000, the then sixteen years of age defendant was adjudicated delinquent on the charge of simple burglary of an inhabited dwelling. The period of supervision ended on June 21, 2002, or two weeks after the murder of Paul Fasullo on June 6, 2002.
As an adult, defendant was arrested on June 18, 2001, and charged with armed robbery, which occurred in the French *152 Quarter.[43] On August 21, 2001, defendant pled guilty to the reduced charged of simple robbery and was sentenced to three years at hard labor, suspended, and placed on two years active probation. Defendant’s probation was revoked on August 14, 2003.
Defendant was eighteen and a half years of age at the time of the instant offense. He did not testify at either phase of his capital trial. However, defendant did communicate with the jury, first through body language,[44] and later during the penalty 14nphase testimony of his mother, who read aloud from the stand a poem written by defendant.[45]
During the penalty phase, the defense presented nine mitigation witnesses: Allan Dressner, Jr., defendant’s brother; Dr. Justin Wiley, a clinical psychologist; Dr. Sanket A. Vyas, a forensic psychiatrist; Rebecca Falgout, defendant’s cousin; Allan Dressner, Sr., defendant’s father; Erin and Catherine “Cathy” Sanders, friends of the family, who attended First Baptist Church of Westwego with defendant; William Edward Schnuelle, Associate Pastor and Senior Elder of Believer’s Fellowship Church in Metairie, defendant’s spiritual advisor; and Shirlene Dressner, defendant’s mother. At the close of the penalty phase, defense counsel offered, for record purposes only, a certified copy of the sen *153 tence imposed on co-defendant, Kellen Parker. The State stipulated Kellen Parker was sentenced to life imprisonment at hai'd labor without benefit of parole, probation, or suspension of sentence.
|4lOn November 18, 2004, the district court imposed the sentence of death, as unanimously recommended by the jury.

PASSION, PREJUDICE AND OTHER ARBITRARY FACTORS

The first-degree murder of Paul Fasullo occurred on June 6, 2002, and following jury selection, trial commenced on May 20, 2004, just under two years after the crime was committed. On January 12, 2004, before defendant’s initial trial setting, the defense filed a motion for change of venue, based on the media attention surrounding the recent trial of co-defendant, Kellen Parker, including as exhibits news articles from the Times-Picayune. The district court denied the motion, and the issue was never revisited when defendant’s trial took place in May 2004. At any rate, the parties were able to conduct voir dire successfully and seat a jury of twelve, plus two alternate jurors, without incurring a single prospective juror, who indicated pre-trial publicity was so widespread as to affect his/her ability to render a fair and impartial decision. Although several prospective jurors were generally aware of the news surrounding defendant’s case, no one indicated during voir dire they were unduly prejudiced by reports of defendant’s crime and had reached a fixed opinion of his guilt.
■The victim, Paul Fasullo, and his wife, Shannon Fasullo, are both Caucasian. Defendant is a Caucasian male; co-defendant, Kellen Parker, is an African American male, as is Troy Arnaud, an accessory to the crime. Race did not appear to be a motivating factor in defendant’s decision to attack the Fasullos in their home.
Defendant’s jury was composed of ten white females, one white male, and one black male. The two alternate jurors were both black females. The defense alleged the State’s peremptory challenges were racially motivated after the State used seven out of nine peremptory challenges to strike African Americans from the jury. |42Likewise, the State accused the defense of the same after the defense used five out of six peremptory challenges to strike white males. After hearing the race-neutral articulations from both the State and the defense, the district court accepted the reasons as legitimate and, for the most part, found no Batson or reverse-Batson violation in the selection of defendant’s jury, with one exception. Despite defense efforts to remove juror Jaelyn Burst, the district court denied the peremptory challenge and seated her as the twelfth juror on the panel. However, because no grounds existed for excluding the juror for cause, her presence on the panel did not interject an arbitrary factor into the proceedings. In all other respects, the record supports defendant’s capital trial was conducted free of any racial taint.

AGGRAVATING CIRCUMSTANCES

The State relied on three aggravating circumstances under La.Code Crim. Proc. art. 905.4(A), and the jury returned the verdict of death, agreeing two aggravating circumstances were supported by the evidence: (1) the offense was committed in an especially heinous, atrocious or cruel manner; and (2) the offender knowingly created a risk of death or great bodily harm to more than one person. La.Code Crim. P. art. 905.4(A)(7) and (4), respectively; see Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The jury heard testimony from the surviving victim, Shannon Fasullo, who was stabbed repeatedly by defendant, as proof defendant intended to murder more than one victim, under La.Code Crim. Proc. art. *154 905.4(A)(4). Defendant’s death sentence is firmly grounded on that aggravating circumstance.
Regarding the heinousness aggravator, as discussed previously, the State’s evidence presented in the guilt phase and reintroduced at the penalty phase established the brutal stabbing of both Paul and Shannon Fasullo. While Paul died |4Sfrom a single stab wound to the chest, he incurred several other stab wounds and blunt force injuries to his head and neck. Shannon, who survived, suffered more cutting wounds than Paul and endured both physical and mental torture.
Furthermore, to demonstrate defendant’s cruelty, in its penalty phase closing argument, the State reminded the jurors Dr. Garcia had opined Paul Fasullo would not have lost consciousness for approximately three to five minutes after sustaining the stab wound to his chest. The prosecutor then re-played the first three minutes of the 911 tape for the jury, using his own watch to mark when three minutes had elapsed, and suggested how cruel it was the last sounds Paul heard as he lay dying were the blood-curdling screams of his wife and baby, whom he was physically unable to help. The grim reality is defendant carried out his murderous rampage in front of the victims’ innocent, two-year-old baby girl, Samantha."[46]
The jury was entitled to hear the witnesses’ description of Shannon’s numerous stab wounds, the description of Paul Fasul-lo’s final moments of life, as well as the coroner’s evaluation of his cause of death. The inclusion of this aggravating circumstance did not interject an arbitrary factor into these proceedings because evidence of
the manner in which the offense was committed and of the nature of the victim’s injuries was relevant and properly admitted at trial. See State v. Roy, 95-0638 (La.10/04/96), 681 So.2d 1230, 1242, cert. denied, 520 U.S. 1188, 117 S.Ct. 1474, 137 L.Ed.2d 686 (1997). In this case, the evidence presented by the State during the guilt stage had already fully informed the jury of the circumstances surrounding the victim’s death. Thus, reintroduction of that evidence at the penalty phase did not interject an arbitrary factor into the proceeding. See La.Code Crim. Proc. art. 144905.2(A)(“The jury may consider [at sentencing] any evidence offered at the trial on the issue of guilt.”).

PROPORTIONALITY REVIEW

Although the federal Constitution does not require proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991); State v. Wille, 559 So.2d 1321, 1340 (La.1990); State v. Thompson, 516 So.2d 349, 357 (La.1987), cert. denied, 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988). This Court, however, has set aside only one death sentence as disproportionately excessive under the post-1976 statutes, finding in that one case, inter alia, a sufficiently “large number of persuasive mitigating factors.” State v. Sonnier, 380 So.2d 1, 9 (La.1979); see also State v. Weiland, 505 So.2d 702, 707-10 (La.1987)(in case reversed on other grounds, *155 dictum suggesting death penalty disproportionate).
This Court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury’s recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. Sonnier, 380 So.2d at 7.
The State’s Capital Sentence Review Memorandum reveals, since 1976, the State has proceeded to trial on eighty-three first-degree murder cases in the Twenty-Fourth Judicial District Court, and of these cases, juries have recommended the death penalty twenty-eight times, including the present case.
| ¿(First case. Benjamin Berry fatally shot a law enforcement officer during a bank robbery. Berry was executed in 1987. State v. Berry, 391 So.2d 406 (La.1980), cert. denied, 451 U.S. 1010, 101 S.Ct. 2347, 68 L.Ed.2d 863 (1981).
Second case. Reginald Smith shot his victim in a lounge parking lot. The victim’s two Mends ran away from the direction of the gunfire. Defendant was found guilty of first-degree murder because a witness saw defendant fire two additional shots in the direction of the parking lot, and the jury found the aggravating circumstance of knowingly created a risk of death or great bodily harm to more than one person. Smith died of natural causes in January 1983. State v. Smith, 391 So.2d 1182 (La.1980).
Third case. Robert Sawyer killed the female victim by beating her and inflicting karate kicks. She was also scalded and set on fire after twice being raped by co-defendant, Charles Lane. In March 1993, Sawyer was executed by lethal injection. State v. Sawyer, 422 So.2d 95 (La.1982); Sawyer v. State, 442 So.2d 1136 (La.1983), cert. denied, 466 U.S. 931, 104 S.Ct. 1719, 80 L.Ed.2d 191 (1984).
Fourth case. Tyronne Lindsey killed a shopper in the Oakwood Mall parking lot. After numerous resentencings and a retrial, Lindsey was once again sentenced to death. State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990). On April 7, 2004, he was resentenced to life in prison pursuant to Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).
Fifth case. Jimmy Robinson killed the husband of an apartment complex manager in her presence during an armed robbery. This Court affirmed the conviction, but vacated the death sentence, and on remand, Robinson received a [ ^sentence of life imprisonment without benefit of parole, probation, or suspension of sentence. State v. Robinson, 421 So.2d 229 (La.1982).
Sixth case. Johnny Taylor stabbed the victim multiple times and stole his car. This Court affirmed the conviction and death sentence. State v. Taylor, 422 So.2d 109 (La.1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1803, 76 L.Ed.2d 367 (1983). Taylor was executed on February 29,1984.
Seventh case. Lane Nelson robbed and stabbed a transvestite, who had picked him up hitchhiking to New Orleans. Before his death sentence was carried out, Nelson’s conviction was reversed, and on retrial, he was convicted of second-degree murder and sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. State v. Nelson, 459 So.2d 510 (La.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 322 (1985). His sentence was commuted by the governor.
Eighth case. Leslie Lowenfield shot and killed his ex-girlfriend, her daughter, *156 her parents, and her current boyfriend. This Court affirmed the conviction and death sentence. State v. Lowenfield, 495 So.2d 1245 (La.1985), cert. denied, 476 U.S. 1153, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986). Lowenfield was subsequently executed in the electric chair.
Ninth case. Glen Weiland stabbed his girlfriend and her ex-husband, killing the female victim. This Court reversed Wei-land’s first-degree murder conviction. State v. Weiland, 505 So.2d 702 (La.1987). On retrial, the state amended the indictment to second-degree murder. The jury subsequently convicted defendant of manslaughter, and he was sentenced to twenty-one years imprisonment at hard labor.
147Tenth case. Robert Tassin shot two victims, one fatally, in the course of an armed robbery/drug deal. The Court affirmed his conviction and sentence. State v. Tassin, 536 So.2d 402 (La.1988), cert. denied, 493 U.S. 874, 110 S.Ct. 205, 107 L.Ed.2d 159 (1989). Tassin obtained a new trial pursuant to federal habeas corpus on March 23, 2007. The Fifth Circuit affirmed. Tassin v. Cain, 517 F.3d 770 (5th Cir.2008). He is awaiting retrial.
Eleventh case. Glen Seals killed a cab driver in the course of an armed robbery. This Court affirmed his conviction and death sentence. State v. Seals, 95-0305 (La.11/25/96), 684 So.2d 368, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997). However, in post-conviction proceedings, this Court reversed his conviction and sentence on grounds the district court failed to make a formal determination of defendant’s competency to proceed after signing a motion appointing a psychiatrist to examine the defendant. State ex rel. Seals v. State, 00-2738 (La.10/25/02), 831 So.2d 828. He is currently awaiting retrial.
Twelfth case. Manuel Ortiz’s case involved a murder-for-hire in which the defendant employed a “hitman” to kill his wife and her friend. This Court affirmed defendant’s conviction and sentence. State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998).
Thirteenth case. Julius Lucky shot two of his co-workers, one fatally, during the course of an armed robbery. This Court affirmed his conviction and death sentence. State v. Lucky, 96-1687 (La.4/13/99), 755 So.2d 845, cert. denied, 529 U.S. 1023, 120 S.Ct. 1429, 146 L.Ed.2d 319 (2000).
Fourteenth case. Edward Harris shot and killed two pedestrians in a drive-by shooting. Finding a Batson violation during jury selection, this Court reversed the first-degree murder conviction and death sentence and remanded the case to the |48district court for a new trial. State v. Harris, 01-0408 (La.6/21/02), 820 So.2d 471. His retrial remains pending. See State v. Harris, 07-1735 (La.9/21/07), 966 So.2d 1038 (Calogero, C.J., concurring).
Fifteenth case. Teddy Chester killed a cab driver during the course of an armed robbery. This Court affirmed his conviction and death sentence. State v. Chester, 97-2790 (La.12/1/98), 724 So.2d 1276, cert. denied, 528 U.S. 826, 120 S.Ct. 75, 145 L.Ed.2d 64 (1999).
Sixteenth case. Allen Snyder stabbed his wife and her new boyfriend, killing the boyfriend. This Court conditionally affirmed his conviction and death sentence, but remanded the case to the district court for a retrospective determination of his competence to stand trial, if one could be made. State v. Snyder, 98-1078 (La.4/14/99), 750 So.2d 832 (Snyder I). On remand, the district court determined a retrospective determination of competency was possible and defendant was competent to stand trial. Defendant appealed, and this Court affirmed. State v. Snyder, 98- *157 1078 (La.4/14/04), 874 So.2d 739 (Snyder II). The United States Supreme Court vacated the judgment and remanded for further consideration of defendant’s Bat-son claims in light of Miller-El v. Dretke, 545 U.S. 281, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). Snyder v. Louisiana, 545 U.S. 1137, 125 S.Ct. 2956, 162 L.Ed.2d 884 (2005). On remand, this Court again affirmed, finding Snyder had failed to carry his ultimate burden of persuasion the State exercised its peremptory challenges in a purposefully discriminatory manner. State v. Snyder, 98-1078 (La.9/6/06), 942 So.2d 484 (Calogero, C.J., Kimball and Johnson, JJ., dissent with reasons)(Snyder III). Once again, the United States Supreme Court granted certiorari and reversed the conviction, holding the trial judge committed clear error in rejecting defendant’s claim the prosecution exercised some of its peremptory challenges based |4flon race in violation of Batson; the case was remanded for further proceedings. Snyder v. Louisiana, 552 U.S. 472, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008). Snyder is awaiting retrial.
Seventeenth case. Emmett Taylor killed a sixty-nine-year-old employee of Rhodes Drug Store, during an armed robbery attempt. This Court affirmed the conviction and death sentence in State v. Taylor, 99-1311 (La.1/17/01), 781 So.2d 1205, cert. denied, 534 U.S. 844, 122 S.Ct. 106, 151 L.Ed.2d 64 (2001).
Eighteenth case. Damon Thibodeaux killed fourteen-year-old Crystal Champagne on the levee during an aggravated rape. This Court affirmed his conviction and death sentence in State v. Thibodeaux, 98-1673 (La.9/8/99), 750 So.2d 916, cert. denied, 529 U.S. 1112, 120 S.Ct. 1969, 146 L.Ed.2d 800 (2000).
Nineteenth case. Elzie Ball killed a Budweiser deliveryman during the course of an armed robbery. On May 23, 1997, Ball was convicted of first-degree murder and sentenced to death. This Court affirmed the conviction and death sentence in State v. Ball, 00-2277 (La.1/25/02), 824 So.2d 1089, cert. denied, 537 U.S. 864, 123 S.Ct. 260, 154 L.Ed.2d 107(2002).
Twentieth and Twenty-first cases. Lawrence Jacobs and Roy Bridgewater committed the double murder of an adult male victim and his mother during the course of an aggravated burglary. The defendants were tried separately, convicted, and each sentenced to death. This Court reversed Jacobs’s conviction and death sentence on grounds the district court erred in denying defendant’s cause challenge and remanded for a new trial. State v. Jacobs, 99-1659 (La.6/29/01), 789 So.2d 1280. During the pendency of his retrial, the United States Supreme Court rendered its decision in Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1(2005)(Eighth Amendment precludes capital punishment for offenders under the age |finof eighteen when they committed their crimes), making Jacobs, who was sixteen at the time of the offense, ineligible to face capital sentencing on retrial. On retrial following this Court’s reversal of the first-degree murder conviction and death sentence, Jacobs was convicted of two counts of second-degree murder; he was sentenced to two consecutive life sentences at hard labor without the benefit of parole, probation, or suspension of sentence. Defendant appealed. The Fifth Circuit reversed defendant’s convictions and remanded on the basis of Batson violations. State v. Jacobs, 07-0887 (La.App. 5 Cir. 5/12/09), 13 So.3d 677. This Court reversed the appellate court’s determination and remanded to the court of appeal for consideration of defendant’s remaining issues raised on appeal. State v. Jacobs, 09-1304 (La.4/5/10), 32 So.3d 227 (per curiam).
*158 In a separate appeal, this Court found the evidence insufficient to support a first-degree murder conviction and, thus, reduced Roy Bridgewater’s conviction to guilty of second-degree murder, reversed the death sentence, and sentenced him to life in prison without benefit of parole, probation, or suspension of sentence. State v. Bridgewater, 00-1529 (La.1/15/02), 823 So.2d 877 (Victory, Knoll, Weimer, JJ., dissenting with reasons). However, on rehearing, this Court held the evidence was sufficient to sustain the first-degree murder conviction and the death penalty was not disproportionate. This Court, therefore, reinstated Bridgewater’s conviction and death sentence. State v. Bridgewater, 00-1529 (La.6/21/02), 823 So.2d 877 (on reh’g), cert. denied, 537 U.S. 1227, 123 S.Ct. 1266, 154 L.Ed.2d 1089 (2003). Bridgewater was subsequently resen-tenced to life in prison pursuant to Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005).
Twenty-second case. Jarrell Neal killed two people during a drug-related burglary. On March 1, 1999, Jarrell Neal was convicted of two counts of first-degree | M murder and sentenced to death. This Court affirmed his conviction and death sentence in State v. Neal, 00-0674 (La.6/29/01), 796 So.2d 649, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).
Twenty-third case. Ryan Matthews shot and killed the victim/owner during a convenience store robbery. Defendant also shot at an eyewitness, but missed. The jury found defendant guilty as charged and sentenced him to death on the basis of two aggravating circumstances: 1) during an armed robbery; and 2) more than one person. Matthews’s appeal was filed in this Court, but the case was remanded to the district court for further evidentiary proceedings related to DNA evidence supporting a claim of actual innocence. The district court granted Matthews’s motion for a new trial, and on August 4, 2004, the state agreed it would not reprosecute the defendant.
Twenty-fouHh case. Thoa Tan Lam entered the home of a former employer and shot four people, two of whom died, and then shot himself in an unsuccessful suicide attempt. Defendant was sentenced to death, and his appeal was filed in this Court, but the case has been remanded for the purpose of conducting an evidentiary hearing on the defendant’s claim the inadequacy of his interpreter denied him due process. On October 28, 2002, the district court notified this Court it had appointed an expert Vietnamese interpreter to review the court reporter’s tapes, etc., as ordered by this Court. No action appears to have been taken on this appeal since December 9, 2003.
Twenty-fifth case. Michael Legrand stabbed the victim to death with several weapons, including kitchen knives, scissors, and screwdrivers, during the course of an armed robbery. On September 28, 2000, Legrand was convicted of first-degree murder and sentenced to death. This Court affirmed the conviction and death sentence in State v. Legrand, 02-1462 (La.12/3/03), 864 So.2d 89, cert. denied, 544 U.S. 947, 125 S.Ct. 1692, 161 L.Ed.2d 523 (2005).
| ^Twenty-sixth case. Shawn Higgins killed the victim with a single gun shot during a confrontation in front of a bar and then ran away. On May 10, 2002, the jury found Higgins guilty of first-degree murder and recommended a death sentence. This Court set aside the jury’s verdict and sentence on the grounds the state presented insufficient evidence to support a finding the murder took place during the perpetration or attempted perpetration of an armed robbery. This *159 Court then rendered a judgment of guilty of second-degree murder and remanded for sentencing to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. State v. Higgins, 03-1980 (La.4/1/05), 898 So.2d 1219, cert. denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005).
Twenty-seventh case. Dustin Dressner, along with co-perpetrator Kellen Parker, each stabbed the victim and the victim’s wife a number of times after forcing their way into the victims’ home. While the victim’s wife survived the attack, the victim died at the scene. On May 23, 2004, the jury found Dressner guilty of first-degree murder and recommended a death sentence, and on November 18, 2004, the district court sentenced Dressner to death. Co-defendant Parker was found guilty as charged of first-degree murder in November 2003, but the jury was unable to reach a consensus in the penalty phase, and thus, Parker was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
Twenty-eighth case. Christopher Ar-ceneaux shot the victim once during an attempted armed robbery. The victim’s 12-year-old daughter witnessed the murder. Arceneaux was found guilty of first-degree murder and sentenced to death. However, during the pendency of Areen-eaux’s capital appeal in this Court, defendant and the state reached an agreement. On February 21, 2008, the district court vacated the death sentence, and defendant pled guilty to first-degree murder in exchange for | S3a sentence of life imprisonment at hard labor “without benefit.” Defendant waived all further appeals of right, and this Court granted defendant’s motion to dismiss his appeal. State v. Arceneaux, 06-2986 (La.2/28/08), 979 So.2d 1262.
The brief outline of the cases above provides strong support for an argument the death penalty imposed in this case is not disproportionate. Employing a statewide basis of comparison, the defendant fares no better. Cases are legion in which this Court has affirmed capital sentences based upon crimes committed in the home. See State v. Holmes, 06-2988 (La.12/2/08), 5 So.3d 42, cert. denied, — U.S. -, 130 S.Ct. 70, 175 L.Ed.2d 233 (2009); State v. Coleman, 06-0518 (La.11/2/07), 970 So.2d 511 (conviction reversed and death sentence vacated by this Court on a Batson violation; remanded for new trial); State v. Leger, 05-0011 (La.7/10/06), 936 So.2d 108, cert. denied, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007); State v. Blank, 04-0204 (La.4/11/07), 955 So.2d 90, cert. denied, 552 U.S. 994, 128 S.Ct. 494, 169 L.Ed.2d 346 (2007); State v. Bridgewater, 00-1529 (La.6/21/02), 823 So.2d 877 (on reh’g), cert. denied, 537 U.S. 1227, 123 S.Ct. 1266, 154 L.Ed.2d 1089 (2003); State v. Jacobs, 99-1659 (La.6/29/01), 789 So.2d 1280; State v. Howard, 98-0064 (La.4/23/99), 751 So.2d 783, cert. denied, 528 U.S. 974, 120 S.Ct. 420, 145 L.Ed.2d 328 (1999); State v. Gradley, 97-0641 (La.5/19/98), 745 So.2d 1160; State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8, cert. denied, 525 U.S. 882, 119 S.Ct. 190, 142 L.Ed.2d 155 (1998); State v.Code, 627 So.2d 1373 (La.1993), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 490 (1994); State v. Burrell, 561 So.2d 692 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991); State v. Perry, 502 So.2d 543 (La.1986), cert. denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987); State v. Williams, 490 So.2d 255 (La.1986), cert. denied, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 780 (1987); State v. Wingo, 457 So.2d 1159 (La.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985); State v. Glass, 455 So.2d 659 (La.1984), cert. denied, 471 U.S. 1080, 105 S.Ct. *160 2159, 85 L.Ed.2d 514 (1985). Compared to these cases, the death sentence in this case is not disproportionate. We find nothing in any of the post trial documents filed pursuant to La.S.Ct.R. XXVIII warrants reversal of defendant’s death sentence.
DECREE
For the reasons assigned herein, the defendant’s conviction and death sentence are affirmed. This judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for cer-tiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing. The district court shall, upon receiving notice from this Court under La.Code Crim. Proc. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La.Rev.Stat. Ann. § 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any State post-conviction proceedings, if appropriate, pursuant to its authority under La.Rev.Stat. Ann. § 15:169; and (2) to litigate expeditiously the claims raised in that application, if filed in the state courts.
AFFIRMED.

 Retired Judge Philip C. Ciaccio, assigned as Justice ad hoc, sitting for Chief Justice Catherine D. Kimball.

. During closing argument, the prosecutor argued defendant is "all [of] five feet, 112 pounds.”

. Defendant’s trial was initially slated for January 12, 2004. On the morning of trial, defense counsel filed a motion for change of venue based on media attention surrounding co-defendant's recent trial, which the district court denied. Thereafter, defense counsel moved for a continuance of trial based, inter alia, on witness problems, which the district court also denied. The defense simultaneously sought writs in the Fifth Circuit and this Court. Jury selection began, and after two days of Witherspoon voir dire, yielding eighty-two death-qualified prospective jurors, the Fifth Circuit granted defendant's writ and ordered the case continued, notwithstanding finding "defense counsel’s motion for continuance is blatantly dilatory.” State v. Dressner, 04-0047 (La.App. 5 Cir. 1/13/04). This Court then denied the simultaneously filed writ as moot. State v. Dressner, 04-0132 (La.1/14/04), 864 So.2d 611. Accordingly, the district court declared a mistrial.

, The defense called Ilis Gilbert, defendant's girlfriend at the time of the murder, and her mother, Daphne Gilbert.

. Troy Arnaud was initially indicted for second-degree murder in connection with this case. However, from the outset, he met with the State and indicated he wanted to assist. Pursuant to a plea agreement, Troy pled guilty to the reduced charge of accessory after the fact of first-degree murder in exchange for truthful testimony against both defendant and Kellen Parker. Troy was sentenced to five years with good time eligibility.

. While Troy had known Parker since elementary school, defendant and Parker apparently met for the first time that day.

. At trial, Ilis testified defendant broke up with her before leaving her apartment that day because her mother, Daphne Gilbert, who also testified at trial, had called his mother to complain about his behavior in her home.

. Troy testified he did not know what was being discussed in the vehicle while he was inside the store making his purchase, but he did notice when he returned Parker had taken his position in the front passenger seat.

. Troy recalled the moments in the car before arriving at the victims’ house. In Troy's view, defendant "always talk about what he about, what he going to do.” They had the radio on and defendant "be rapping or he be talking towards the rap, and the rap was something like, well, you know, I'm about killing people, I do this and that” and "I ain’t scared to die or whatever.” Troy further testified, while defendant did say "that he feel like killing somebody,” Troy explained "he always talk like that.... That’s not the first time that *131 come out his mouth, you following what I'm saying?”

.Shannon Fasullo described these parties as weekly, sometimes bi-weekly, during which the participants would partake of certain drugs, including alcohol, marijuana, cocaine, and Ecstacy.
Narcotics agent Eddie Greer testified regarding the narcotics and drug paraphernalia found at the scene:
Five viles [sic] containing a white, powder residue, later identified as cocaine, three plastic bags, small bags, of marijuana and marijuana seeds; some drug paraphernalia; a razor blade; a mirror; and I[saw] some rolling papers; and I think a little small spoon.
The above described items along with a scale were seized from a dresser drawer in the master bedroom. A bamboo pipe was also seized from the desk in the “home office."

. According to Shannon, defendant had attended a few parties the victims hosted in their home, but Shannon Fasullo had not seen defendant since approximately three weeks before the night in question. When Shannon last saw defendant, he came to her home and requested entrance, which she refused because she was entertaining friends. The defendant on that occasion left with no cross words or disagreement.

. She testified defendant appeared calm and unintoxicated.

. Shannon described Paul as thin and slightly taller than defendant at "five something-five.” Paul was 39 years old on the night of the attack; Shannon was twenty-two.

. Troy Arnaud testified, when they all broke and ran, Parker dropped the piggy bank in the parking lot of an abandoned business. However, the next morning, Parker went back to the parking lot, gathered the change from the piggy bank, and then used the money to get his hair fixed.

. Occasionally, the record spells this deputy's surname "Bellegrin.”

. A photograph taken at the scene depicts the child in a t-shirt holding a stuffed monkey with a blood-like substance splattered and smeared across her shirt and on her forehead, nose, chin, hands, legs, and feet.

. Detective Morales explained a print track machine is a computer into which one puts a description of a person and the computer then "picks out similar people that look like that person. And the computer actually picks these people out, and you keep doing it ... till you have five people that look like the person of interest. And then, you press another button that randomizes them. What it does, it just switches around, so you have no control where that person is at. The computer picks that out. So then you print it out, and it comes out just like this — a photograph with six people, including the person of interest.”

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. According to Dr. Garcia, sharp force injuries, like stab wounds, are caused by a sharp object slicing through tissue.

. Dr. Garcia explained lacerations result from an object hitting skin and causing it to split. Such wounds are associated with blunt force trauma.

.Dr. Garcia described patterned abrasions as being caused by hard contact with an object sufficient to scrape off skin and leave an impression of the object’s pattern on the skin.

.She cataloged the wounds: (1) single stab wound to left upper chest, twelve inches from the top of his head and one inch to left of his midline (fatal wound), see infra-, (2) stab wound to right side of neck, five-eights of an inch in length (superficial); (3) two superficial cuts to the right side of his neck, three and two and half inches in length, respectively; (4) patterned abrasion on right cheek measuring three and a half by three and a half inches; (5) abrasion on right ear; (6) three-inch laceration on top of scalp (blunt force trauma); (7) laceration on the side of previously described laceration (blunt force trauma); (8) linear abrasion on right upper chest; and (9) linear scratches to neck.

. Dr. Garcia explained perforated means to "go through and through.”

. According to Dr. Garcia, penetrated means to go "into but not out of.”

. Although Dr. Garcia’s testimony emphasized the fatal insignificance of the remaining wounds, the autopsy photographs admitted into the record depict wounds, which can only be described as gruesome, particularly those to scalp. In fact, from the photographs, the single stab wound to the chest appears rather minor in comparison to the others.

. The State gave its opening statement, and immediately thereafter, the district court stayed the proceedings until 2:00 p.m., so the court of appeal could rule on defendant’s writ. The stay extended on, and consequently, the sequestered jury did no other work on this case for the remainder of May 20, 2004.

. Justice Victory is not shown as signing.

. It should be noted defendant gave three custodial statements to the police on June 7, 2002, and none of those statements referenced the anticipated defense he was pro-voiced into taking deadly action because something sexual transpired between the victims and his girlfriend some two months earlier.

. As previously noted, at the outset of her guilt phase testimony, Shannon Fasullo acknowledged she and Paul engaged in recreational drug use, weekly, sometimes bi-weekly. She admitted Paul had previously used cocaine, and she had used Ecstasy. She knew defendant “had participated in a couple of parties” at their home.

. Certiorari denied by Anthony v. Louisiana, 531 U.S. 934, 121 S.Ct. 320, 148 L.Ed.2d 258 (2000).

. Overruled on other grounds by State v. Dunn, 07-0878 (La.1/25/08), 974 So.2d 658.

. M’Naughten’s Case, 1 Car. & K. 130 (1843).

. Superseded by statute on other grounds as stated in State v. Turner, 05-2425 (La.7/10/06), 936 So.2d 89.

. Before trial, defendant moved to strike the aggravating circumstance of heinousness. At a hearing on December 12, 2003, the district court took up the matter and, after hearing argument, denied defendant's motion announcing "I have sat through the co[-]defendant's case, and I had trouble sleeping that week. I thought this crime was particularly heinous. So, I'm going to deny the motion.''
On or about March 8, 2004, the defense filed a second motion requesting the district court reconsider its motion to strike heinousness as an aggravating factor. The district court again denied the motion on March 31, 2004.

. Opinion supplemented by State v. Hoffman, 00-1609 (La.6/14/00), 768 So.2d 592, and certiorari denied by Hoffman v. Louisiana, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000).

. A similarly worded limiting instruction was given in Manning, in which this Court upheld the jury’s verdict of death based on aggravating factors, including heinousness. Id., 03-1982 at p. 71, 885 So.2d at 1105.

. Appellate counsel seeks to distance defendant from any participation in the attack on Shannon Fasullo, who survived multiple stab wounds and lacerations. Counsel erroneously adopts defendant’s self-serving statement in which he took responsibility solely for the fatal stab wound to the chest of victim, Paul Fasullo. However, the testimony of Shannon Fasullo left no doubt defendant wielded the knife that slashed Shannon’s face from her forehead through her left eye and down to her lip, which was gashed in two. Defendant tried to slit her neck three or four times as he straddled her while she lay on the ground trying to fend off his attacks. Accordingly, appellate counsel’s notion Kellen Parker was solely accountable for the wounds suffered by Shannon is not supported by the record.
Importantly, La. Code Crim. Proc. art. 905.4(A)(7) speaks of ”[t]he offense ... committed in an especially heinous, atrocious or cruel manner,” and in this case, the offense was perpetrated upon two victims: Paul and Shannon Fasullo. The fact Shannon survived should have no effect on evaluating the entirety of defendant's actions, as presented by the State, which were sufficient to merit the jury's return of the heinousness aggravator.
Additionally, in the guilt phase, the State advanced their theory of the case defendant committed the first-degree murder during the late night home invasion of Paul and Shannon Fasullo and notified the jury the offense occurred during the perpetration or attempted perpetration of an armed robbery or aggravated burglary. La.Rev.Stat. § 14:30(A)(1). The State also argued defendant had the specific intent to kill or inflict great bodily harm
*147 upon more than one person. La.Rev.Stat. § 14:30(A)(4). Following the guilt phase, the judge charged the jury on these two definitions of first-degree murder. The jury returned the general verdict of guilty as charged of first-degree murder.
Consequently, appellate counsel cannot truthfully suggest defendant’s actions toward Shannon Fasullo, even as Paul Fasullo lay dying from blood loss, did not represent "torture of the victim or the pitiless infliction of unnecessary pain.” State v. Wille, 559 So.2d 1321, 1336 (La.1990).

. This Court once reflected, "Any normal human being will experience his share of childhood scrapes, razor nicks, blood test pricks and various other episodes producing practical knowledge of blood coagulation .... and [could] employ this type of practical knowledge in his deliberations....” State v. Graham, 422 So.2d 123, 132 (La.1982). The same would surely hold true for evaluating the pain caused by such cutting injuries.

. At the time of trial, defendant's father had been employed by Delta Airlines as a baggage handler at Armstrong International Airport for twenty-six years. Mrs. Dressner has worked as a baby-sitter for family members and as a stock clerk at Winn Dixie.

. Dr. Wiley referred to defendant’s birth as anoxic, meaning a shortage of oxygen to the brain, resulting in a primitive brain, like a "monkey” or "caveman,” capable of fight or flight. Dr. Wiley opined the lack of oxygen impacted defendant's executive function.

. Dr. Wiley was retained by the defense approximately two weeks before he testified and admitted on the stand he had never before testified as an expert. He further conceded he did ftot write a report in this matter.

. At the conclusion of testimony from the second mental health expert and outside the presence of the jury, Judge Liljeberg chastised defense counsel for bringing in a second expert to say the exact same thing as the first, thereby wasting two hours of the jury's time.

. During the testimony of Dr. Wiley, the State objected to not being given the records this expert reviewed. Defense counsel finally handed the State a copy of the information while the expert was on the stand, notwithstanding the State had been asking (and litigating) for production of those records since October 10, 2002.

. In conjunction with the armed robbery charge, defendant was also charged with criminal mischief, illegal carrying of a weapon, receiving stolen things, and simple battery.
The victim of defendant’s French Quarter robbery, William Knight, testified at the penalty phase and positively identified defendant in court as the person, who robbed him in 2001. Mr. Knight explained he was approached by two males, and one of them hit him over the head. While he was down on the ground, they took his wallet. Also testifying to those events was Sgt. Derek Gray, NOPD officer assigned to the Eighth District, who witnessed the robbery and testified he performed a safety patdown after he apprehended defendant and recovered Mr. Knight’s wallet.

. During his guilt phase testimony, Sgt. Dennis Thornton noted at some point since defendant's arrest, but before his capital trial, defendant had gotten a tear-drop tattoo below his right eye. At the prosecutor’s request, defendant stood before the jury box, displaying his facial tattoo. Although no explanation was given as to the significance of the tattoo at trial and there is no formally accepted signification for such tattoos, we note the teardrop tattoo generally, but not always, signifies the person has killed someone. See Henderson v. Cockrell, 333 F.3d 592, 595 (5th Cir.2003), cert. denied, 540 U.S. 1163, 124 S.Ct. 1170, 157 L.Ed.2d 1208 (2003); Commonwealth v. Silanskas, 433 Mass. 678, 746 N.E.2d 445, 452-53 (2001). See contra, Gonzales v. Quarterman, 458 F.3d 384, 394-95 (5th Cir.2006)(teardrop tattoo can have "multiple meanings’’), cert. denied, 549 U.S. 1323, 127 S.Ct 1909, 167 L.Ed.2d 568 (2007).

.Shirlene Dressner read this poem, which defendant penned, to the jury:
Mother, you taught me everything, and everything you've always given me, I’ve always kept it inside. You're the hard push in my life. There isn’t anyone or anything I could be; it just wouldn't feel right if I didn't have you by my side.
You were there for me to love and care for me when skies were gray, and when I was down, you always was there to comfort me. And no one else could be what you have been to me. You will always be the girl in my life for all times. You're always there for me and always been around for me, even when I was bad.
You showed me right from wrong. And you took up for me, even when everyone else was downing me. You always did understand. You gave me strength to go on. There was so many times, looking back, when I did wrong. But even though I was bad, you made me feel like I belong.
There was many times when I saw a friend, you came to me saying I could face anything. And no one could replace you for space in my heart.
Love you, Dustin.

. According to the CSIR, the victim's brother, Anthony (A.J.) Fasullo, told the representative from the department of probation and parole "Sammie” is now seeing a psychiatrist. "She has terrible memories of this tragedy.” Once, in the car with her grandparents, Sammie began screaming hysterically, and when they asked what was wrong, she said, "I have blood all over my hands.”